IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MICHELLE C.,

       **Plaintiff,**

v.                                 **Case No.: 2:22-cv-00554**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Complaint and Defendant's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 6, 7).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion be **GRANTED** to the extent that it requests remand of the Commissioner's decision, (ECF No. 6); the Commissioner's motion for judgment on the pleadings be **DENIED**, (ECF No.

7); the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On April 18, 2019, Plaintiff Michelle C. ("Claimant") filed for DIB, alleging a disability onset date of March 5, 2019 due to "keratoconus both eyes,[1] severe depression, anxiety, panic attacks with passing out, bilateral knee pain, migraines, high blood pressure, low back pain, and trouble sleeping." (Tr. at 208, 223). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 15). Claimant filed a request for an administrative hearing, which was held on January 18, 2022 before the Honorable Francine A. Serafin, Administrative Law Judge (the "ALJ"). (Tr. at 35-55). On March 24, 2022, the ALJ issued a written decision, finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-34). The ALJ's decision became the final decision of the Commissioner on October 7, 2022 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed a Transcript of the Administrative Proceedings. (ECF No. 5). Thereafter, Claimant filed a Brief in Support of Complaint, (ECF No. 6), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 7), to which Claimant filed a reply, (ECF No. 8). Consequently, the matter is fully briefed and ready for resolution.

---

[1] "Keratoconus is a vision disorder that occurs when the normally round cornea (the front part of the eye) becomes thin and irregular (cone) shaped. This abnormal shape prevents the light entering the eye from being focused correctly on the retina and causes distortion of vision." https://www.aoa.org/healthy-eyes/eye-and-vision-conditions/keratoconus?sso=y.

## II.    **Claimant's Background**

Claimant was 51 years old on her alleged disability onset date and 54 years old on the date of the ALJ's decision. (Tr. at 28). She completed high school, communicates in English, and previously worked as a teacher assistant, receptionist, and cashier. (Tr. at 49, 222, 224).

## III.    **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the

limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents such findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting

with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for DIB through December 31, 2024. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since her alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: osteoarthritis, rheumatoid arthritis, migraines, major depressive disorder, generalized anxiety disorder, panic disorder, keratoconus, and trochanteric bursitis. (Tr. at 18, Finding No. 3). The ALJ also considered Claimant's hypertension, gastroesophageal

reflux disease (GERD), and Achilles tendonitis, but the ALJ found that the impairments were non-severe. (Tr. at 18).

Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18-23, Finding No. 4). Accordingly, the ALJ found that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds. She can frequently balance, stoop, kneel, and crouch, but only occasionally crawl. The claimant should avoid frequent exposure to extreme cold, heat, wetness, vibration, and workplace hazards such as moving machinery or unprotected heights. The claimant is capable of avoid[ing] ordinary office hazards such as boxes on the floor or open doors. She is capable of seeing large print but cannot see ordinary print such as newspaper or book size print. The claimant is capable of learning, remembering, and performing work like activity that is not at an assembly line or production rate pace or that involves any strict production quotas. The claimant is capable of occasional, superficial interaction with coworkers and the general public.

(Tr. at 23-27, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform any past relevant work. (Tr. at 27-28, Finding No. 6). Therefore, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 28-29, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1968 and was defined as an individual closely approaching advanced age on her alleged disability onset date; (2) Claimant had at least a high school education; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled" regardless of her transferable job skills. (Tr. at 28, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert

("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a garment folder, sorter, and stuffer. (Tr. at 28-29, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 29, Finding No. 11).

## IV. Claimant's Challenges to the Commissioner's Decision

Claimant asserts two challenges to the Commissioner's decision, including that the ALJ failed to properly (1) evaluate the opinion evidence regarding her mental limitations and (2) develop the record regarding her vision impairments. (ECF No. 6 at 2-6). In response, the Commissioner argues that the ALJ properly evaluated the opinion evidence and included most of the limitations that the consultative psychologist assessed. (ECF No. 7 at 6-11). Also, the Commissioner contends that the record was sufficiently developed for the ALJ to make an informed decision regarding Claimant's vision impairments, and Claimant's representative confirmed during the administrative hearing that the record was complete. (ECF No. 7 at 11-14). In reply, Claimant emphasizes that the ALJ's RFC analysis precludes meaningful review. (ECF No. 8 at 2). Further, Claimant notes that her representative requested a consultative vision examination because the record was incomplete, the state agency physicians stated that a physical consultative examination was needed, and the prior consultative examination in the record was not performed by a vision specialist and did not include visual field testing. (*Id.* at 4-5). Therefore, Claimant argues that the ALJ's findings were based only on her lay analysis of the objective findings regarding Claimant's vision without any medical opinions on those findings. (*Id.* at 5).

## V. Relevant Medical History

The undersigned reviewed all of the evidence before the Court. The evidence that

is most relevant to the instant matter is summarized as follows.

### A. Treatment Records

Claimant presented to her family physician, Philip Galapon, M.D., every few months from August 2018 through July 2019. Dr. Galapon prescribed medications for Claimant's reported anxiety and depression. (Tr. at 326-27, 330-31, 335, 339-40, 349-50). He recorded normal psychiatric examination findings, and Claimant denied severe mental symptoms or functional issues. (*Id.*).

In February 2019, Claimant presented to ophthalmologist Michael B. Beres, M.D. (Tr. at 586). She complained of blurred vision in both eyes, near and at a distance; decreased ability to read; and increasing difficulty driving at night and reading road signs. (*Id.*). Her bilateral vision was 20/40 with full confrontation visual fields. (Tr. at 586-87). An examination of her retina showed posterior vitreous detachment, but her optic nerve and vessels were normal. (*Id.*). Dr. Beres diagnosed Claimant with bilateral keratoconus, essential hypertension, vitreous degeneration, and other vitreous opacities. (Tr. at 587). He referred her to ophthalmologist Heather Skeens, M.D., at the West Virginia Cornea & Cataract Center of Excellence, for further evaluation. (*Id.*).

Dr. Skeens examined Claimant on March 15, 2019. (Tr. at 576). Claimant reported that her vision was blurry at all times, and she stopped wearing her contact lenses due to eye dryness and other issues. (*Id.*). Her vision was 20/80 in her right eye and 20/200 in her left eye. (*Id.*). She had full extraocular motility and confrontational visual fields. (Tr. at 577). Dr. Skeens diagnosed Claimant with dry eye syndrome, mild keratoconus, and mild cataracts in both eyes. (Tr. at 577). She discussed that Claimant might require cataract surgery and corneal transplant in the future, but she recommended monitoring the conditions at that time and referred Claimant to an optometrist for specialty scleral

lenses.[2] During a subsequent visit on August 27, 2019, Claimant told Dr. Skeens that her vision was getting worse, and the scleral contact lenses were "so cloudy." (Tr. at 567). Her uncorrected vision was 20/150-1 in her right eye and 20/200-1 in her left eye. (*Id.*). Her visual field testing was the same. (Tr. at 568). Dr. Skeens recommended bilateral cataract surgery. (Tr. at 571). In addition to the previously diagnosed conditions, Dr. Skeens diagnosed Claimant with corneal scarring in both eyes from recurrent childhood viral infections. (Tr. at 569-70).

Claimant underwent left cataract surgery on October 14, 2019. (Tr. at 564). Her uncorrected vision in her left eye on the day following surgery was 20/300. (*Id.*). She still had normal Amsler Grid testing and full extraocular motility and confrontational visual fields. (*Id.*). By November 6, 2019, Claimant's uncorrected left eye visual acuity improved to 20/100-1. (Tr. at 561). Her Amsler Grid test results were normal, she had full extraocular motility, and her visual fields were full to confrontation. (Tr. at 561-62). Claimant told Dr. Skeens that she was "doing good." (Tr. at 561). Her vision was not as blurry in her left eye, which seemed to be improving, but her eye was itchy with some irritation. (*Id.*). Dr. Skeens discussed with Claimant that she would not achieve best corrected visual acuity (BCVA) without scleral lenses to correct her keratoconus, and Claimant should not proceed with right eye cataract surgery until she was completely satisfied with her left eye vision. (Tr. at 563). Dr. Skeens again referred Claimant to Dr. Beecher to be fitted for a left eye scleral contact. (*Id.*). On February 17, 2020, Dr. Beecher recorded that Claimant's corrected visual acuity was 20/30 bilaterally. (Tr. at 434).

On March 24, 2021, Claimant returned to Dr. Galapon, stating that she was seeing

---

[2] "Designed to vault over the entire corneal surface and rest on the sclera, scleral lenses can morph an irregular cornea into a smooth optical surface to correct vision problems caused by keratoconus and other forms of corneal ectasia." https://www.aao.org/eyenet/article/update-on-scleral-lenses

a nurse practitioner and was diagnosed with bipolar disorder with panic and was doing well until she recently lost her niece to breast cancer. (Tr. at 558). She had three really bad days of depression with panic one week prior, but she continued to take her psychotropic medication with otherwise good control. (*Id.*). Dr. Galapon prescribed medications for bipolar disorder. (Tr. at 559).

### B. Opinions, Evaluations, and Prior Administrative Findings

On March 10, 2020, state agency physician Narendra Parikshak, M.D., assessed that Claimant could perform light exertional work with frequent postural activities and no concentrated exposure to extreme cold, wetness, or hazards. (Tr. at 72-73). Dr. Parikshak did not assess any vision restrictions, noting that Claimant's neurology records did not suggest them. (Tr. at 73). However, she stated that a consultative examination was required because the additional evidence needed to evaluate the claim was not contained in the records from the treating providers. (Tr. at 69). She stated that there was no ophthalmology evaluation regarding Claimant's keratoconus. (Tr. at 73).

On March 24, 2020, psychologist Cassie Richards-Ward, M.A., performed a consultative mental status examination of Claimant. Claimant explained that she was applying for benefits because she was legally blind in her left eye and had problems with her knees, panic disorder, and depression. (Tr. at 457). The primary reasons that she could not work were reportedly that she could not see to complete any assignments and "black[ed] out" due to panic disorder. (*Id.*). The majority of Claimant's mental status examination findings were normal during the consultative session, except that she demonstrated fair eye contact, depressed and anxious mood, restricted affect, moderately impaired concentration, and mildly impaired social functioning. (Tr. at 459-60). On the same date, Ms. Richards-Ward completed a form concerning Claimant's ability to do

mental work activities. She opined that Claimant had moderately limited ability to make judgments on simple and complex work-related decisions; understand, remember, and carry out complex instructions; interact appropriately with the public, supervisor(s), or co-workers; and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 462, 464). Ms. Richards-Ward noted that Claimant's cognitive functioning was judged to be in the deficit range, and her concentration and short-term memory were impaired. (*Id*.). The social limitations were based on Claimant's subjective allegations. (Tr. at 464).

On April 27, 2020, state agency psychiatrist James Binder, M.D., assessed Claimant's mental RFC based upon his review of her medical records. Dr. Binder concluded that Claimant had mild functional limitations in the paragraph B criteria, except that she had moderately limited ability to concentrate, persist, or maintain pace. (Tr. at 70). Regarding specific work activities, Binder assessed that Claimant had moderately limited ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 75-76). Nonetheless, Dr. Binder found that Claimant could learn and perform simple tasks in a work-like setting. (Tr. at 75).

On July 14, 2020, state agency psychologist Holly Cloonan, Ph.D., assessed that Claimant had mild limitations in the paragraph B criteria, except that she had moderate limitations in interacting with others and concentrating, persisting, or maintaining pace. (Tr. at 85). Dr. Cloonan affirmed Dr. Binder's RFC finding other than adding that Claimant had moderately limited ability to interact with the general public or get along

with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 90). Dr. Cloonan concluded that Claimant did not have any limitation regarding interacting with supervisors. (*Id*.). Overall, Dr. Cloonan found that Claimant could learn, remember, and perform work-like activities that did not require meeting production line schedules or more than occasional superficial interactions with coworkers or the general public. (*Id*.).

On July 14, 2020, Rabah Boukhemis, M.D., affirmed Dr. Parikshak's previous RFC finding. (Tr. at 87-89). He noted that Claimant's vision was 20/60 in her right eye and 20/40 in her left eye in March 2019, a consultative examination was needed, and there was still no ophthalmological evaluation in the file. (Tr. at 84, 88-89). On September 21, 2020, Laura Cunnings, FNP-C, performed a consultative physical examination of Claimant. Claimant reported that she wore contact lenses for keratoconus and was legally blind in her left eye, but she had a driver's license and could drive. (Tr. at 485). She had not been recommended for corneal transplant yet. (*Id*.). Her corrected vision was 20/100 bilaterally during the examination. (Tr. at 486).

### C. Claimant's Testimony

Claimant testified during her administrative hearing on January 18, 2022 that she had teratomas and was legally blind in her left eye. (Tr. at 40). Her vision was blurry in her right eye, and it was "starting to do the same thing" as the left. (*Id*.). Claimant stated that she could only read by using reading glasses in addition to her contacts and putting what she was reading up close to her face, and she had trouble seeing the television screen, could not drive for approximately the past year due to poor vision, and tripped over objects on the floor because she could not see them. (Tr. at 41-42). She also had panic attacks which caused her to shake and experience stomach pain and headaches. (Tr. at

43). "Anything" could trigger her panic attacks. (*Id*.). Her concentration was fine, but she had trouble in social situations around groups of people and suffered from memory loss. (*Id*.).

### D. Other Evidence

On December 9, 2021, Claimant's attorney sent the ALJ a letter requesting a vision consultative examination with visual field testing. (Tr. at 315). Claimant's representative stated that the evidence from Claimant's treating sources and contained in the record was inadequate to allow for a proper disability determination. (*Id*.).

## VI.  <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree

with such decision." *Blalock*, 483 F.2d at 775.

**VII.** **Discussion**

Claimant's challenges concerning the ALJ's consideration and development of the medical evidence primarily relate to the ALJ's RFC assessment and finding. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.*

According to SSR 96-8p, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p,

14

1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### A. *Mental Opinion Evidence*

Claimant contends that the ALJ's analysis of the mental opinion evidence precludes meaningful review. Specifically, Claimant argues that the ALJ found Ms. Richards-Ward's opinion persuasive, yet she did not incorporate any RFC restrictions to account for the moderate mental functional limitations that Ms. Richards-Ward assessed. (ECF No. 6 at 3). Ms. Richards-Ward opined that Claimant had moderately limited ability to make judgments on simple and complex work-related decisions, interact appropriately with supervisors, and respond appropriately to usual work situations and to changes in a

routine work setting. (Tr. at 462, 464). Claimant asserts that, because the ALJ found Ms. Richard-Ward's opinion persuasive, she was obligated to assess RFC restrictions regarding Claimant's ability to make work-related decisions, interact with supervisors, and respond to work situations and changes. (ECF No. 8 at 2-3). As Claimant explained, this challenge focuses on whether the ALJ committed legal error, not whether substantial evidence supports the ALJ's findings. (ECF No. 8 at 1-2); *see Dennis v. Kijakazi*, No. 21-2078, 2023 WL 2945903, at *5 (4th Cir. Apr. 14, 2023) ("This Court's substantial evidence review applies only to the agency's factual findings, not to whether the ALJ has applied correct legal standards," "[a]nd an ALJ's failure to sufficiently explain her conclusions about a claimant's residual functional capacity is an error of law that warrants reversal and remand.") (citations and markings omitted).

Under the revised regulation that governed Claimant's application, the ALJ was not required to defer or give any specific evidentiary weight, including controlling weight, to any medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(a). Rather, the ALJ was required to evaluate the persuasiveness of the opinions and findings based on five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) extent of the treatment relationship, and (5) other factors. 20 C.F.R. § 404.1520c(a), (c). The ALJ must articulate his or her consideration of the supportability and consistency of the medical opinions and prior administrative medical findings, but the ALJ is not obligated to explain how he or she considered the other regulatory factors. 20 C.F.R. § 404.1520c(b)(2).

Here, Claimant underwent a consultative mental status examination in March 2020. As noted, the psychologist, Ms. Richards-Ward, assessed certain moderate mental functional limitations. (Tr. at 462, 464). Two state agency psychologists then reviewed

Ms. Richards-Ward report, along with the rest of the record, and made prior administrative findings as to Claimant's mental RFC. Dr. Binder concluded at the initial level of review in April 2020 that Claimant could learn and perform simple tasks in a work-like setting. (Tr. at 75). Dr. Cloonan found at the reconsideration level of review in July 2020 that Claimant could learn, remember, and perform work-like activities that did not require meeting production line schedules or more than occasional superficial interactions with coworkers or the general public. (Tr. at 90).

In the decision, the ALJ considered Ms. Richards-Ward's consultative examination findings, explicitly noting the moderate functional limitations that are the focus of Claimant's challenge. (Tr. at 26-27). The ALJ stated that she found Ms. Richards-Ward's opinion persuasive and interpreted similar paragraph B findings, concluding that Claimant had moderate limitations interacting with others and maintaining concentration, persistence, and pace. (Tr. at 22, 27). As to the prior administrative findings, the ALJ was not persuaded by Dr. Binder's opinion, but she concluded that Dr. Cloonan's assessment was largely persuasive, except that the ALJ added that Claimant had a severe impairment of panic disorder. (*Id.*). The ALJ assessed the exact same RFC limitations as Dr. Cloonan, restricting Claimant to jobs that did not involve an assembly line or production rate pace or any strict production quotas and only occasional, superficial interaction with coworkers and the general public. (Tr. at 23).

Based on the above, the ALJ very clearly explained the basis for the mental RFC finding and there was no unexplained disconnect or conflict between the ALJ's determination that Ms. Richards-Ward's opinion was persuasive and the ALJ's RFC finding. Ms. Richards-Ward found that Claimant had no more than moderate functional limitations, which was defined as "more than a slight limitation," but "the individual is

still able to function satisfactorily." (Tr. at 462-64). Ms. Richards-Ward did not render any opinion that the moderate limitations restricted Claimant's RFC. Moreover, the ALJ's RFC finding is consistent with Dr. Cloonan's RFC assessment, which is based on Ms. Richards-Ward's consultative examination findings. Ultimately, the ALJ assessed the relevant evidence concerning Claimant's mental impairments and explained the basis for the RFC finding to allow for meaningful review.

This matter is clearly distinguishable from prior decisions that were remanded because the ALJ found an opinion or prior administrative finding persuasive but assessed completely different restrictions without explanation. *See, e.g., Stephen F. v. Kijakazi*, No. 3:22-CV-00413, 2023 WL 3575653, at *7 (S.D.W. Va. May 3, 2023), *report and recommendation adopted,* 2023 WL 3572894 (S.D.W. Va. May 19, 2023). Here, the RFC finding is consistent with the evidence that the ALJ found persuasive and there is a clear logical bridge from evidence to conclusion. The undersigned **FINDS** no error in the ALJ's analysis of Ms. Richards-Ward's opinion.

### B. Duty to Develop the Evidence

Claimant next argues that the ALJ failed to develop the evidence concerning her vision impairments, although Claimant requested a consultative vision examination and both state agency physicians who reviewed the record to make prior administrative findings noted that there was no ophthalmological evaluation in the file. (ECF No. 6 at 4-5). Claimant emphasizes that the ALJ's RFC assessment that she can see large print and avoid hazards in the workplace were based solely on the ALJ's own analysis of objective medical evidence without any medical opinion on the issue. (ECF Nos. 6 at 5-6, 8 at 5).

An "ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record." *Cook v. Heckler*, 783 F.2d 1168, 1173

18

(4th Cir. 1986). The ALJ "cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Id.* However, an ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Perry v. Astrue*, No. 3:10-CV-01248, 2011 WL 5006505, at *16 (S.D.W. Va. Oct. 20, 2011) (quoting *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001)); *Fuller v. Saul*, No. 3:19-CV-00174, 2020 WL 597596, at *5 (S.D.W. Va. Jan. 13, 2020), *report and recommendation adopted,* 2020 WL 597425 (S.D.W. Va. Feb. 6, 2020); *Savage v. Saul*, No. 3:20-CV-00482, 2021 WL 2168909, at *8 (S.D.W. Va. May 7, 2021), *report and recommendation adopted,* 2021 WL 2169514 (S.D.W. Va. May 27, 2021); *Lewanda Terriel S. v. Saul*, No. CV TMD 19-1146, 2020 WL 2794588, at *4 (D. Md. May 29, 2020). The ALJ's duty is to ensure that the record contains sufficient evidence upon which the ALJ can make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009); *Jones v. Saul*, No. 1:19-cv-275-GCM, 2020 WL 2411635, at *3 (W.D.N.C. May 12, 2020). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

Evidence is "insufficient" to evaluate a disability claim when the SSA does not have all of the information needed to make a determination. 20 C.F.R. § 404.1520b(b). The evidence is "inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." *Id.* If the evidence is

insufficient or inconsistent, the ALJ can take a number of actions to develop the record, including recontacting medical sources for additional evidence or clarification, requesting additional existing evidence, or ordering a consultative examination. *Id*. The ALJ can also question witnesses, request evidence, and subpoena witnesses. *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 272 (D. Md. 2003) (citing 20 C.F.R. §§ 404.944, 404.950(d)). The ALJ may order a consultative examination when the evidence as a whole is insufficient to allow the Commissioner to make a determination or decision on the claim or when there is an inconsistency in the evidence. *McKenzie v. Colvin*, No. CIV. TMD 13-1026, 2014 WL 3955588, at *12 (D. Md. Aug. 12, 2014) (citing 20 C.F.R. § 404.1519a(b)). The need for a consultative examination arises if, for example, the additional evidence needed is not contained in the records of the claimant's medical sources; the evidence that may have been available from the claimant's treating or other medical sources cannot be obtained for reasons beyond the claimant's control, such as death or noncooperation of a medical source; highly technical or specialized medical evidence that the Commissioner needs is not available from the claimant's treating or other medical sources; or there is an indication of a change in the claimant's condition that is likely to affect the claimant's ability to work, but the current severity of the claimant's impairment is not established. *Id*. (internal markings omitted).

Ultimately, the claimant must establish a prima facie entitlement to benefits, and he or she consequently bears the risk of nonpersuasion. *Bell v. Chater*, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (citing *Seacrist v. Weinberger,* 538 F.2d 1054, 1057 (4th Cir. 1976) and 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.")). Thus, the ALJ is not required to act as a claimant's counsel

and can presume that the claimant's counsel presented the strongest case for benefits. *Bell v*, 1995 WL 347142, at *4; *Perry*, 2011 WL 5006505, at *15. The ALJ's duty to develop the record does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation. *Perry*, 2011 WL 5006505, at *15 (citations and markings omitted).

In this matter, the ALJ listed Claimant's allegations, including that she had to wear contacts and reading glasses to read small print, had trouble seeing the television, and tripped over things in her home because she could not see them. (Tr. at 24). The ALJ also cited Claimant's vision treatment records, including her left cataract surgery and the fact that, by February 2020, Claimant's corrected visual acuity improved to 20/30 bilaterally, her visual field was still full to confrontation, and her Amsler grid testing remained normal. (Tr. at 25). The ALJ noted that Claimant's corrected vision was 20/100 at the time of her consultative examination in September 2020. (*Id.*). Finally, the ALJ stated that she was not persuaded by the state agency physicians' prior administrative findings that Claimant did not have any vision limitations related to keratoconus. (Tr. at 27). Ultimately, the ALJ assessed that Claimant could perform a range of work that included no frequent[3] exposure to hazards such as moving machinery and unprotected heights, although Claimant could avoid ordinary office hazards such as boxes on the floor or open doors. (Tr. at 23). Further, she could see large print, but could not see ordinary print such as newspaper or book size print. (*Id.*).

It is unclear how the ALJ arrived at her RFC assessment of Claimant's visual limitations, including her ability to work around moving machinery and unprotected

---

[3] "Frequent means occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *6.

heights up to one-third of the workday; always avoid tripping over boxes on the floor, open doors, and other ordinary office hazards; and read large print. As Claimant points out, the assessment was not based on any medical opinion or findings. It also did not correspond to Claimant's allegations or any other specific evidence in the file. While the ALJ was not required to base the RFC assessment on a medical opinion or particular piece of evidence, she was obligated to fully analyze Claimant's ability to see, which was a contested functional ability, and explain her reasons for arriving at the RFC finding. Claimant's vision and its impact on her ability to work was a critical inquiry in this case, but the ALJ failed to adequately discuss her analysis and findings regarding it. There is no cogent analysis from evidence to conclusion regarding Claimant's ability to see, which precludes meaningful review of the RFC assessment.

The ALJ ordered a general physical consultative examination of Claimant. However, she did not develop the record in any manner regarding Claimant's vision impairments, although further information was very clearly necessary to make an informed disability determination. Notably, both state agency physicians remarked upon the absence of an ophthalmological evaluation, and Claimant specifically requested a consultative vision examination with vision testing. In the RFC analysis, the ALJ explicitly relied on the fact that Claimant's corrected vision improved to 20/30 in February 2020 after she underwent left cataract surgery. (Tr. at 21, 25, 26). That explanation does not elucidate the RFC limitations that the ALJ assessed, and the ALJ did not reconcile it with conflicting evidence from the consultative examination seven months later. The consultative examiner found that Claimant's corrected visual acuity was 20/100 in September 2020. (Tr. at 486). The ALJ acknowledged the results of the later vision test, but she did not explain how that evidence factored into the RFC analysis or reconcile it

with the evidence from the treating sources. There was either a substantial conflict in the evidence regarding Claimant's visual acuity, or Claimant's condition significantly declined in approximately seven months. Either way, the record clearly prompted further development of the evidence regarding Claimant's vision impairments. The ALJ's errors in this regard were not harmless because Claimant's ability to see and avoid hazards directly impacted her vocational prospects. The VE testified that the inability to avoid ordinary workplace hazards, such as boxes on the floor or open doors, precluded employment. (Tr. at 54-55).

The Commissioner contends that Claimant cannot fault the ALJ for not developing the record because her representative stated at the onset of the January 2022 administrative hearing that the record was complete. (ECF No. 7 at 12). However, that discussion between Claimant's attorney and the ALJ appeared to concern information from Claimant's treating sources. The ALJ questioned whether the record needed to be held open for receipt of certain vision records from Dr. Beres. (Tr. at 38). Claimant's attorney stated that those vision records were submitted, and the record did not need to be held open for that reason. (*Id.*). Although Claimant's attorney did not again mention the need for a consultative examination, as he had requested in writing, there is no evidence that he withdrew the request for vision testing or warranted that it was unnecessary.

In any event, the record does not contain sufficient information for the Court to evaluate whether the ALJ's RFC analysis of Claimant's ability to see is supported by substantial evidence. For that reason, the undersigned **FINDS** that the ALJ's decision precludes meaningful review and **RECOMMENDS** that this matter be **REMANDED** for further development and/or explanation of Claimant's vision impairments.

## VIII.  <u>Recommendations for Disposition</u>

For the above reasons, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion to the extent that it requests remand of the Commissioner's decision, (ECF No. 6); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 7); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 14, 2023

Cheryl A. Eifert
United States Magistrate Judge